IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH H. WILKOSKI *Administratrix of the Estate of Zachary J. Wilkoski, Deceased*, <br><br> Plaintiff, <br><br> v. <br><br> B&T EXPRESS, INC., a corporation, CADILLAC TRANSPORTATION, INC., a corporation, LOGISTICS by B&T, INC., a corporation, OMCO ENTERPRISES, LLC, ALJEN ENTERPRISES, LLC., A.T.T. TRUCKING, LLC, QUINN 1, LLC, and RTQ2, LLC, <br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 18-1359 |

## OPINION

Presently pending before the court are cross motions for partial summary judgement. The matters have been fully briefed and are ripe for disposition. The central question is whether plaintiff may proceed on a joint venture theory of liability. For the reasons stated herein, we hold she cannot.

## I.  Procedural and Factual Background

This matter was removed from the Court of Common Pleas of Allegheny County on October 11, 2018 [Doc. 1] and was originally assigned to Chief Magistrate Judge Cynthia Reed Eddy, who entered several case management and scheduling deadlines in the case. A Second Amended Complaint was filed on November 14, 2019, after which time this matter was reassigned to the undersigned on February 4, 2020. [Doc. 56].

The following motions are before the court: 1) a motion for partial summary judgment

[110] filed on behalf of plaintiff Deborah H. Wilkowski, administratrix of the estate of decedent Zachary J. Wilkoski ("Plaintiff"), with supporting Concise Statement of Material Facts ("CSMF")("Pl.'s CSMF") [Doc. 111], with separately filed exhibits [Doc. 113] and brief in support. [Doc. 112]; 2) a motion for partial summary judgment [118] filed on behalf of defendants  B&T Express, Inc. ("B&T Express"), Logistics by B&T, Inc. ("Logistics"), Omco Enterprises, LLC ("Omco"), Aljen Enterprises, LLC ("Aljen"), A.T.T. Trucking, LLC ("A.T.T."), Quinn 1, LLC ("Quinn") and RTQ2, LLC ("RTQ2") (jointly "Affiliated Companies"), with supporting Appendix [Doc. 119], Concise Statement of Material Facts ("Affiliated Companies' CSMF") [Doc. 120], and brief in support [Doc. 121]; and 3) a motion for partial summary judgment filed on behalf of Defendant Cadillac Transportation, Inc. ("Cadillac") [Doc. 122] with Concise Statement of Material Facts ("Cadillac CSMF") [Doc. 123].

Plaintiff seeks a finding that B&T Express and its sister affiliates, Omco, Aljen, A.T.T., Quinn and RTQ2, engaged in a joint venture or were partners so that they are allegedly jointly and severally liable for the negligence of Arthur Wells in causing the accident with Plaintiff's decedent on December 6, 2017. Defendants have filed their own motions for partial summary judgment seeking a judgment that they were not engaged in a joint venture/partnership with one another.

Pursuant to Court Order and in accordance with the local rules of this Court, the parties filed Concise Statements of Material Facts, and responses thereto.  Unless otherwise stated or noted, the following facts are not in dispute.

### A.  Affiliated Companies' CSMF

*The Accident*

1. On December 6, 2017, at approximately 4:50 p.m., Plaintiff's decedent, Zachary Wilkoski ("Wilkoski"), and Arthur Wells ("Wells"), were involved in a motor vehicle accident on State Route 28 south, in the Township of O'Hara, about ½ mile east of Exit 6 at the Highland Park Bridge, in Allegheny County, Pennsylvania. See ¶¶ 38-39 of Plaintiff's Second Amended Complaint [Doc. 46].[2]

2. At that time, Wilkoski was driving a 2016 Ford Mustang westbound on Route 28 and had stopped due to traffic being stopped ahead. *Id.*

3. At about the same time, Wells, who was driving a tractor with a trailer/flatbed ("tractor-trailer") westbound, failed to timely see the stopped traffic, and struck Wilkoski's 2016 Ford Mustang from behind, causing the accident. *Id.*

4. Wilkoski died as a result of the injuries he sustained in the accident on December 8, 2017. *Id.*

*Wells and the tractor-trailer*

5. At the time of the accident, Wells was a statutory employee of B&T Express pursuant to § 390.5 of the Federal Motor Carrier's Safety Regulations ("FMCSR") and was acting within the course and scope of his employment and agency with B&T Express. *See* Nos. 1-2 of the Answers of B&T Express and Wells to Plaintiff's Request for Admissions, which is included in the Affiliated Companies' Appendix (ECF No. 119)[1] as Exhibit "A."

6. At the time of the accident, Wells was operating the tractor-trailer on behalf of and under the Department of Transportation ("DOT") authority of B&T Express. *See* ¶ 3 of the Answer of B&T Express to Plaintiff's Second Amended Complaint [Doc. 55]; *see also* ¶ 3 of the Answer of Wells to Plaintiff's Second Amended Complaint [Doc. 52].

---

[1] Unless otherwise stated, all references to exhibits are hereinafter found in the Affiliated Defendants' Appendix filed at ECF No. 119.

7. The tractor Wells was driving was a 2014 International Tractor, Unit No. 1436 ("the tractor" or "Unit 1436"), which was owned by A.T.T. *See* the Ohio Apportioned Registration Cab Card for the 2014 International Tractor, which is included in the Appendix as Exhibit "**B.**"

8. B&T Express was the registered operator of Unit No. 1436. *Id.*

9. Unit 1436 was leased to B&T Express by A.T.T. pursuant to a written Independent Contractor Agreement. *See* the Independent Contractor Agreement between B&T Express and A.T.T., which is included in the Affiliated Companies' Appendix as Exhibit "C."[2]

10. The flatbed trailer that was attached to the tractor being driven by Wells was a 2007 Fona semi-trailer, Unit No. 568, and registered to Traficanti Trucking, LLC. *See* the State of Maine Long Term Semi-Trailer Registration for Unit No. 568, which is included in the Affiliated Companies' Appendix as Exhibit "D"; *see also* pp. 48-49 of the deposition transcript ("D.T.") of Breen O'Malley ("O'Malley"), included in the Affiliated Companies' Appendix as Exhibit "E."

11. Unit No. 568 was leased[3] to B&T Express by Traficanti Trucking, LLC. *See* p. 50 of the D.T. of O'Malley, Exh. E of Affiliated Companies.

*Defendants' admissions*

12. Defendants have admitted that Wells was acting in the course and scope of his employment with Cadillac Transportation, Inc. when the tractor-trailer that Wells was operating on State Route 28 South in the Township of O'Hara near the Highland Park Bridge, Allegheny County, Pennsylvania collided with a 2016 Ford Mustang driven by Wilkoski. *See* No. 1 of

---

[2] Plaintiff takes issue with this characterization, stating that as shown in its supporting documents, "the written agreement . . . was ineffective due to not including payment terms required by such an agreement and it was not signed and accepted by B&T Express, Inc." and challenges the agreement because A.T.T. was not paid on the customary basis of a percentage of revenue but instead B&T Express distributed A.T.T. a share of its profits related to the number of truck tractors A.T.T. supplied to B&T Express in relation to other defendants. (ECF No. 138 at 2).
[3] Plaintiff disagrees with the factual statement as no written agreement (as required under the Federal Motor Carrier Safety Regulations) has been produced and because Traficanti Trucking (owned by a shareholder of B&T Express) submitted the unit and was not paid in a customary fashion.  (ECF No. 138 at 3).

Defendants' Stipulation of Certain Facts [Doc. 116].

13. Defendants have further admitted that Wells was operating the tractor-trailer on behalf of B&T, and under the authority issued to B&T, by the United States Department of Transportation ("DOT") at the time of the collision with the 2016 Ford Mustang driven by Wilkoski. *See* No. 2 of Defendants' Stipulation of Certain Facts [Doc. 116].

14. Defendants also have admitted that Wells was negligent and caused the accident, while Wilkoski was not negligent in causing the accident. *See* Nos. 3-4 of Defendants' Stipulation of Certain Facts [Doc. 116].

*B&T Express, Inc.*

15. B&T Express is a corporation organized and existing under the laws of the state of Ohio, having been incorporated on October 16, 1986. *See* ¶ 2 of the Answer of B&T Express to Plaintiff's Second Amended Complaint [Doc. 55]; *see also* the Articles of Incorporation for B&T Express, which is included in the Appendix as Exhibit "F."

16. B&T Express maintains a principal place of business at 400 Miley Road, North Lima, Ohio 44452. *See* ¶ 2 of the Answer of B&T Express to Plaintiff's Second Amended Complaint [Doc. 55].

17. B&T Express is engaged in a trucking transport business that includes leasing drivers and tractors and trailers[4] and operating them under the DOT authority of B&T Express. *See* ¶ 2 of the Answer of B&T Express to Plaintiff's Second Amended Complaint [Doc. 55].

18. At the time of the accident in 2017, Breen O'Malley, Thomas Cook and Anthony

---

[4] Plaintiff disagrees with the contention that B&T leases drivers from the other named defendants, and contends that the drivers are employed by Cadillac and assigned, not leased to B&T Express for its use, and Cadillac is then reimbursed. Plaintiff further notes that as for leased equipment, not all Affiliated Defendants have written lease agreements and of those written leases, payment terms are not provided. Rather, according to Plaintiff, the tractor and trailer equipment from Affiliate Companies is submitted by the companies for B&T Express to use to be paid in non-customary way. (ECF No. 138 at 3-4, citing record).

Traficanti were shareholders of B&T Express. *See* pp. 8-10 of the D.T. of O'Malley, Exh. E.

19. Howard O'Malley, Breen O'Malley's father, previously held shares amounting to 25% ownership in B&T Express but said shares were put into a trust for his son, Breen. *See* p. 10 of D.T. of O'Malley, Exh. E.

20. Thus, at the time of the accident, each of the following owned 25% of B&T Express: Breen O'Malley; a trust for Breen O'Malley; Thomas Cook; and Anthony Traficanti. *See* p. 10 of D.T. of O'Malley, Exh. E.

21. At the time of the accident in 2017, Breen O'Malley was the President and Thomas Cook was the Vice President of B&T Express. *See* p. 10 of D.T. of O'Malley, Exh. E.

22. Mr. O'Malley primarily handled the business operations, while Mr. Cook primarily handled the day-to-day operations, including the day-to-day finances, of B&T Express. *See* p. 32 of the D.T. of Thomas Cook ("Cook"), true and correct portions, without Exhibits, which are included in the Appendix as Exhibit "G"; *see also* pp. 19-20 of the D.T. of William Rypcinski ("Rypcinski"), without Exhibits, which are included in the Appendix as Exhibit "H."

23. William Rypcinski was the Vice President of Operations for B&T Express and handled the development of the business. *See* pp. 16-17 of the D.T. of Rypcinski. Exh. H.

24. Jennifer Long was the Safety Department Manager of B&T Express. See pp. 17-19 of the D.T. of Rypcinski, Exh. H.

25. B&T Express had no employees. *See* p. 10 of D.T. of O'Malley, Exh. E.

26. In its transportation business, B&T Express utilized equipment that came with a driver, i.e., owner-operators, and equipment that did not come with a driver. *See* pp. 20-21 of the D.T. of Rypcinski, Exh. H; *see also* pp. 66-67 of the D.T. of Daniel Perry ("Perry"), Exhibit "I."

27. According to B&T Express, it had written or oral agreements with entities for the

lease of a specific piece of equipment; Plaintiff contends otherwise, as previously explained.

28. Loads being hauled by B&T Express were assigned by a dispatcher based on the location of the load and the availability of drivers and the equipment; the dispatchers did not know who owned the equipment being used and there was no preference for using equipment of certain entities. *See* pp. 44-45 of the D.T. of Perry, Exh. I; *see also* pp. 19-22, 55-67 of the D.T. of O'Malley, Exh. E.

29. For instance, the load being transported by Wells at the time of the accident was assigned to him by dispatch at B&T Express' terminal/facility in Winfield, Alabama. *See* pp. 4-5, 7-9 of the D.T. of Christopher Newman ("Newman"), true and correct portions, without Exhibits, which are included in the Appendix as Exhibit "J."

30. Owners-operators were paid a commission for each load, i.e., a percentage of the load. *See* p. 67 of the D.T. of Perry, Exh. I.

31. The entities that leased equipment, such as tractors or trailers, to B&T Express were either paid a set weekly/monthly amount, or a percentage of the load; B&T Express also paid the third-party debt payments associated with the leased equipment.[5] *See* Response 5 of the October 24, 2019, letter from Bodine Perry, Exh. K; *see also* pp. 19-23, 26-27 of the D.T. of Cook, Exh. G.

32. The accountant for B&T Express, Daniel Perry, testified that when B&T Express was incorporated, Mr. O'Malley and Mr. Cook did not have "family money" or other assets so that B&T Express could purchase its own tractors and trailers, so they leased them from others. *See* pp. 36-37 of the D.T. of Perry, Exh. I.

---

[5] Again, Plaintiff disputes this characterization, as explained supra, and further, "though B&T Express paid third-party debt payments associated with the equipment it used, such was part of the understanding and manner of operating the B&T Express business for the benefit of all its shareholders." (ECF No. 138 at 6).

33. This included B&T leasing tractors and trailers personally owned by its owners/stockholders, which Mr. Perry thought was not a good idea, so that he recommended limited liability companies be formed to own the tractors and trailers. *See* p. 37 of the D.T. of Perry, Exh. I.

34. Corporate tax returns were filed every year for B&T Express. See B&T Express U.S. Corporate Tax Returns for 2014 through 2018, true and correct copies (with financial information redacted), which are included in the Appendix as Exhibit "L."

35. The corporate tax returns for B&T Express reflect B&T Express's payment/cost for the lease of owners-operators, personnel such as office staff, and for equipment. *See* B&T Express Tax Returns, Exh. L; *see also* Response 4b of the October 24, 2019, letter from Bodine Perry, Exh. K; pp. 70-74 of the D.T. of Perry, Exh. I.

36. Mr. Perry, B&T Express' accountant, also explained that in regard to B&T Express leasing equipment from other entities, such as Omco or Aljen, he would make sure that the lease payments were reasonable for the year and make of the tractor or trailer at issue. *See* pp. 61-64 of the D.T. of Perry, Exh. I.  According to Plaintiff, these transactions were not arm's length leases but rather, the Affiliated Companies "were distributed monies according to the tax returns of all those defendants that was in direct relation to each entity's extent of contributing truck tractors to the motor carrier for furthering the business in which all were partners."  [Doc. 138 at 7].

37. There are no written agreements between B&T Express and any of the other entities as to their relationship. *See* p. 53 of the D.T. of Perry, Exh. I.

38. B&T Express did not file any consolidated income tax returns with any other entity. *See* p. 54 of the D.T. of Perry, Exh. I.

39. According to Affiliated Defendants, none of the entities involved in the lawsuit are

owned or subsidiaries of B&T Express, nor is there common ownership among the entities; although some of them have the same owners/members, there is not common ownership because the percentage of ownership is not the same. *See* pp. 54-55 of the D.T. of Perry, Exh. I. Plaintiff contends that despite Mr. Perry's testimony, "each of the 25% shareholders of B&T Express owns an affiliate which owns the equipment submitted to B&T for use, which provides commonality among all the entities and particularly does not permit the submission of equipment by the affiliates in exchange for distributions to be arm's length leasing transaction." [Doc. 138 at 8].

*Cadillac Transportation, Inc.*

40. Cadillac was incorporated on November 4, 2009, in Indiana, and has a principal place of business located at 86 N. Bridge Street, Gary, Indiana. *See* ¶ 4 of the Answer of Cadillac to Plaintiff's Second Amended Complaint [Doc. 73].

41. Breen O'Malley and Thomas Cook are the two shareholders of Cadillac. *See* ¶ 22 of the Answer of Cadillac to Plaintiff's Second Amended Complaint [Doc. 73].

42. Cadillac was created to provide commercial drivers because Mr. O'Malley did not want B&T Express to have trucking employees so that B&T Express would have to deal with unionization and issues surrounding same. *See* pp. 16 and 62 of the D.T. of O'Malley, Exh. E.

43. Mr. O'Malley testified that his father, who had been in the trucking business for many years, did not have a good experience with unions. *See* p. 16 of the D.T. of O'Malley, Exh. E; *see also* p. 12 of the D.T. of Cook, Exh. G.

44. B&T Express leased drivers from Cadillac. *See* Response 4b of the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff avers that the drivers were not leased from Cadillac, as noted in her response to paragraph 17 *supra*.

45. According to the Affiliated Companies, Cadillac is paid by B&T Express for the lease of drivers. *See* Response 4 of the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff admits that "Cadillac is only reimbursed for what it pays drivers that are assigned to B&T Express solely for the reasons set forth in paragraphs 42 and 43, which is why Cadillac exists, and as such was not in a lease transaction whereby Cadillac as a separate entity could earn a profit or even intended to earn a profit."  [Doc. 138 at 8-9].

46. Plaintiff has produced no evidence of record to support that Cadillac receives or shares in any profits from B&T Express.

47. While Plaintiff admits it has produced no evidence of record to support that Cadillac shares in any of B&T Express losses, Plaintiff denies "that the use of Cadillac by the B&T Express transport business partnership will ever have losses because Cadillac is always and only reimbursed the amount of driver earnings." [Doc. 138 at 9].

48. Cadillac filed corporate tax returns every year. *See* Cadillac U.S. Corporate Tax Returns for 2014 through 2018, true and correct copies (with financial information redacted), which are included in the Appendix as Exhibit "M."

49. The revenues reported on the income tax returns of Cadillac have been reconciled with the cost of the leased drivers as identified in the tax returns for B&T Express. *See* Response 4a and Exhibit A to the October 24, 2019, letter from Bodine Perry, Exh. K.

*Logistics*

50. Logistics was incorporated in Ohio on April 17, 1995 and maintains a principal place of business at 400 Miley Road, North Lima, Ohio. *See* ¶ 6 of the Answer of Logistics to Plaintiff's Second Amended Complaint [Doc. 64]; *see also* Articles of Incorporation of Logistics, which is included in the Appendix as Exhibit "N."

51. The shareholders of Logistics are Breen O'Malley and Thomas Cook. *See* ¶ 22 of the Answer of Logistics to Plaintiff's Second Amended Complaint [Doc. 64].

52. According to Affiliated Companies, Logistics employed, and then leased, mechanics, dispatchers and other office and support staff to B&T Express. *See* Response 4b of the October 24, 2019, letter from Bodine Perry, Exh. K.  Plaintiff contests this, stating "it is denied that such employees are leased in an arm's length transaction where Logistics as lessor generates or intends to generate a profit from leasing employees.  On the contrary, such employees are assigned to the B&T Express transport operation and B&T Express always and only reimburses Logistics by B&T for the earnings of such employees."  [Doc. 138 at 9-10].

53. According to Affiliated Companies, Logistics is paid by B&T Express for the lease of employees such as office staff or mechanics. *See* Response 4 of the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff contests this for the reasons stated in paragraph 52.

54. According to Affiliated Companies, Plaintiff has produced no evidence of record to support that Logistics receives or shares in any profits from B&T Express. Plaintiff admits that "no evidence of a share of profits may exist," however, "Logistics by B&T does not exist for making a profit and the operations by B&T Express do not permit Logistics by B&T to make a profit or incur losses.  On the contrary, Logistics will not realize a profit nor will it ever share in B&T Express losses, if any, because Logistics always and only receives reimbursement for the earnings of its employees."  [Doc. 138 at 10].

55. Plaintiff has produced no evidence of record to support that Logistics shares in any of B&T Express losses. Plaintiff contests this for the reasons stated in her response to paragraph 54.

56. As with Cadillac, Logistics was created because of concerns about unionization of employees in commercial trucking. *See* pp. 16 and 62 of the D.T. of O'Malley, Exh. E.

57. The revenues reported on the income tax returns of Logistics have been reconciled with the cost of the leased mechanics and other personnel as identified in the tax returns for B&T Express. *See* Response 4a and Exhibit A to the October 24, 2019, letter from Bodine Perry, Exh. K.

### Omco Enterprises, LLC and Aljen Enterprises, LLC

58. Omco is a limited liability company that was formed on September 16, 2004; it does business at 6824 Twin Oaks Court, Canfield, Ohio. *See* ¶ 8 of Omco's Answer to Plaintiff's Second Amended Complaint [Doc. 61]; *see also* Omco's Operating Agreement, which is included in the Appendix as Exhibit "O."  Plaintiff contends that "its operations are actually conducted on a day-to-day basis in the headquarters of B&T Express by the employees of Logistics by B&T assigned to B&T Express and by Messrs. O'Malley and Cook who are not employed by any defendant entity, by William Rypcinski and by Jennifer Long." [Doc. 138 at 11].

59. Omco's members are Breen O'Malley and Thomas Cook. *See* ¶ 22 of Omco's Answer to Plaintiff's Second Amended Complaint [Doc. 61].

60. Breen O'Malley owns 95% of Omco, while Thomas Cook owns 5% of Omco. *See* Omco U.S. Corporate Tax Returns, with financial information redacted, for 2014-2017, which are included in the Appendix as Exhibit "P."

61. Omco owns tractors and trailers and leases them to B&T Express. *See* ¶ 8 of Omco's Answer to Plaintiff's Second Amended Complaint [Doc. 61]; *see also* pp. 23-24 of the D.T. of Perry, Exh. I. Plaintiff contests this, as set forth in her response to paragraphs 17 and 31, noting that "though Omco holds title to such equipment, such equipment is totally in the possession and control of the B&T Express transport business partnership." [Doc. 138 at 11, citing, Deposition

of Cook at pp. 15-18, answers to interrogatories filed at Pls.'s App'x at 4, 6, and 8, and the depositions of Traficanti and O'Malley.

62. According to Affiliated Companies, Omco filed corporate tax returns every year. *See* Omco Tax Returns, Exh. P. Plaintiff notes that "Omco filed form 1065 partnership returns." [Doc. 138 at 11].

63. Aljen is a limited liability company that was formed on September 16, 2004; it does business at 3932 Montereale Drive, Canfield, Ohio. *See* ¶ 10 of Aljen's Answer to Plaintiff's Second Amended Complaint [Doc. 59]; *see also* Aljen's Operating Agreement, which is included in the Appendix as Exhibit "Q." Plaintiff posits that "its operations are actually conducted on a day-to-day basis in the headquarters of B&T Express. . . . by the employees of Logistics by B&T assigned to B&T Express and by Messrs. O'Malley and Cook who are not employed by any defendant entity, by William Rypcinski and by Jennifer Long."  [Doc. 138 at 12].

64. Aljen's members are Breen O'Malley and Thomas Cook. *See* ¶ 22 of Aljen's Answer to Plaintiff's Second Amended Complaint [Doc. 59].

65. Thomas Cook owns 95% of Aljen, while Breen O'Malley owns 5%. *See* Aljen U.S. Corporate Tax Returns, with financial information redacted, for 2014-2017, which are included in the Appendix as Exhibit "R."

66. According to Affiliated Companies, Aljen owns tractors and trailers and leases them to B&T Express. *See* ¶ 10 of Aljen's Answer to Plaintiff's Second Amended Complaint [Doc. 59]; see also pp. 23-24 of the D.T. of Perry, Exh. I.  Plaintiff admits that tractors and trailers are titled in the name of Aljen, which are submitted by Aljen to B&T Express and are not leased as set forth in her response to paragraphs 17 and 31. Although Plaintiff admits Aljen holds title to

such equipment, it is in the possession and control of the B&T Express transport business partnership, citing record at Pl.'s Appendix Ex. 11 Cook deposition, App. Exs. 4, 6, 8, 28, (Traficanti deposition) and 27 (O'Malley Deposition).

67. Aljen filed corporate tax returns every year. *See* Aljen Tax Returns, Exh. R. Plaintiff states that on the contrary, Omco filed form 1065 partnership returns. [Doc. 138 at 13].

68. According to Affiliated Companies, both Omco and Aljen are paid by B&T Express for its lease of their tractors and trailers. *See* Response No. 5 and Exhibit B to the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff admits that Omco and Aljen are distributed monies directly and for their benefit from B&T Express revenue, but for the reasons explained in its objections to the factual averments contained in paragraphs 17, 31, 61 and 66, denies that the arrangement was leasing. [Doc. 138 at 13].

69. Affiliated Companies aver that Plaintiff has produced no evidence of record to support that either Omco or Aljen receive or share in any profits from B&T Express. In response, Plaintiff states that the record shows "B&T Express distributed to Omco, Aljen, A.T.T., Quinn 1, and RTQ2 monies to pay debt amortizations on equipment each affiliate owned and monies that would otherwise have been a profit of B&T Express for which B&T Express would have tax liabilities," citing to Pl.'s App. Exs. 13, 1, 15, 16, and 18. [Doc. 138 at 13].

70. Plaintiff has produced no evidence of record to support that either Omco or Aljen shares in any of B&T Express losses. Plaintiff admits this but states "the tax returns and accounting records do not show B&T Express ever had losses. In further response, based on the manner of operating, if B&T Express had losses or no funds to distribute, Omco, Aljen, A.T.T., Quinn, and RTQ2 would have received no distributions and/or would have suffered the non-payment by B&T Express of equipment loan amortization," citing Pl.'s Exs. 13, 15, 16, 17 and

18.

71. It was at the recommendation of B&T Express' accountant, Mr. Perry, and legal counsel that Omco and Aljen were legally formed. *See* pp. 36-37 of the D.T. of Perry, Exh. I; *see also* p. 26 of the D.T. of O'Malley, Exh. E.

> *A.T.T. Trucking, LLC*

72. According to Affiliated Companies, A.T.T. is a limited liability company that was formed on October 12, 2006; it does business at 2817 Poland Village Boulevard, Poland, Ohio. See ¶ 12 of A.T.T.'s Answer to Plaintiff's Second Amended Complaint [Doc. 60]; see also Articles of Organization for A.T.T., which is included in the Appendix as Exhibit "S." Plaintiff contends that "its operations are actually conducted on a day-to-day basis at the headquarters of B&T Express . . . by the employees of Logistics by B&T assigned to B&T Express and by Messrs. O'Malley and Cook who are not employed by any defendant entity, by William Rypcinski and by Jennifer Long." [Doc. 138 at 14].

73. Anthony Traficanti is the sole owner/member of A.T.T.; Breen O'Malley and Thomas Cook do not own any part of A.T.T. See p. 5 of the D.T. of Anthony Traficanti ("Traficanti"), true and correct portions which are included in the Appendix as Exhibit "T."

74. According to Affiliated Companies, A.T.T. owns tractors and trailers and leases them to B&T Express. See ¶ 12 of A.T.T.'s Answer to Plaintiff's Second Amended Complaint [Doc. 60]; *see also* p. 23 of the D.T. of Traficanti, Exh. T. Plaintiff contends that "though A.T.T. holds title to such equipment, such equipment is totally in the possession and control of the B&T Express transport partnership," citing Pl.'s App. Ex. 11, 4, 6, 8, 28 , 27 and 31. [Doc. 138 at 14].

75. According to Affiliated Companies, A.T.T. is paid by B&T Express for the use of its tractors and trailers. *See* p. 42 of the D.T. of Traficanti, Exh. T; *see also* p. 43 of the D.T. of

Perry, Exh. I; *see also* Exhibit B to the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff denies this as stated, admitting that A.T.T. is distributed monies directly and for its benefit from B&T Express revenue, but denies that A.T.T. is paid based on arm's length lease transactions, incorporating her responses to paragraphs 17 and 31. [Doc. 138 at 15].

76.  According to Affiliated Companies, neither A.T.T., nor Anthony Traficanti, its sole member, have any decision making in the management or control of B&T Express. *See* pp. 21, 31-32 of the D.T. of Traficanti, Exh. T. Plaintiff states, "Anthony Traficanti is a shareholder of B&T Express." [Doc. 138 at 15].

77. According to Affiliated Companies, A.T.T. does not receive or share in any profits from B&T Express. See p. 47 of the D.T. of Traficanti, Exh. T.  Plaintiff denies this and states, "on the contrary, A.T.T. receives the benefit of B&T Express payments directly to finance companies associated with its equipment and distributes funds to A.T.T. that would otherwise be a profit for B&T Express who would incur tax liability as set forth in Plaintiff's responses to paragraphs 17 and 31."  [Doc. 138 at 15].

78. According to Affiliated Companies, Plaintiff has produced no evidence of record to support that A.T.T. shares in any of B&T Express profits or losses. Plaintiff denies that no evidence was produced, noting that B&T Express distributed to Omco, Aljen, A.T.T., Quinn, and RTQ2 monies to pay debt amortizations on equipment each affiliate owned and monies that would otherwise have been a profit of B&T Express for which B&T Express would have tax liabilities. [Doc. 138 at 16-17], citing Pl.'s App. Ex. 13, 1, 15, 16, 17 and 16.

79. According to Affiliated Companies, prior to 2006, Anthony Traficanti personally owned tractors and trailers; A.T.T. was formed so that Anthony Traficanti had protection from personal liability. See pp. 11-12 of the D.T. of Traficanti, Exh. T. Plaintiff contends it "was

Messrs. O'Malley and Cook that recommended creating A.T.T. Further, though A.T.T. may serve as protection from personal liability or tortious conduct, it has distinct benefits set forth in the opinion letter of John Lally, CPA," citing Pl.'s Exs. 1, 11, 28. [Doc. 138 at 16].

*Quinn 1, LLC and RTQ2, LLC*

80. Quinn is a limited liability company that was formed on July 22, 2010; it does business at 7532 Huntingdon Drive, Youngstown, Ohio. See ¶ 14 of Quinn's Answer to Plaintiff's Second Amended Complaint [Doc. 62]. Plaintiff admits this in part, noting that Quinn's operations are conducted on a day-to-day basis at the headquarters of B&T Express by the employees of Logistics by B&T assigned to B&T Express and by Messrs. O'Malley and Cook who are not employed by any defendant entity, by William Rypcinski and by Jennifer Long." [Doc 138 at 16].

81. Howard O'Malley, Jr. is the sole member of Quinn. See ¶ 24 of Quinn's Answer to Plaintiff's Second Amended Complaint [Doc. 62].

82. According to Affiliated Companies, Quinn owns tractors and trailers and leases them to B&T Express. See ¶ 14 of Quinn's Answer to Plaintiff's Second Amended Complaint [Doc. 62]. Plaintiff denies this, instead taking the position that while Quinn holds title to such equipment, it is totally in the possession and control of the B&T Express transport business partnership, citing to Pl.'s Exs. 11, 4, 66, 8, 28, and 27.

83. Any income received by Quinn was recorded and reported in Schedule C to the Income Tax Returns of Howard O'Malley. *See* Schedule C of the Income Tax Returns of O'Malley, with financial information redacted, for 2014-2017, which are included in the Appendix as Exhibit "U."

84. According to Affiliated Companies, RTQ2 is a limited liability company that was

formed on September 18, 2006; it does business at 7532 Huntingdon Drive, Youngstown, Ohio. *See* ¶ 16 of RTQ2's Answer to Plaintiff's Second Amended Complaint [Doc. 63]. Plaintiff denies its operations are conducted on a day-to-day basis at the headquarters of B&T Express by the employees of Logistics by B&T assigned to B&T Express and by Messrs. O'Malley and Cook who are not employed by any defendant entity, by William Rypcinski and by Jennifer Long.' [Doc. 138 at 17].

85. Howard O'Malley, Jr. is the sole member of RTQ2. See ¶ 24 of Quinn's Answer to Plaintiff's Second Amended Complaint [Doc. 63].

86. RTQ2 owns tractors and trailers and leases them to B&T Express. See ¶ 16 of RTQ2's Answer to Plaintiff's Second Amended Complaint [Doc. 63]. Plaintiff contests this and states that, as explained supra, while the tractors and trailers are titled in the name of RTQ2, which are submitted by RTQ2 to B&T Express and are not leased . . . .  though RTQ2 holds title to such equipment, such equipment is totally in the possession and control of the B&T Express transport business partnership," citing Pl.'s Ex. 11 4, 6, 8, 28, 27. [Doc. 138 at 18].

87. Both Quinn and RTQ2 are paid by B&T Express for the use of their tractors and trailers. See pp. 103-104 of the D.T. of Perry, Exh. I; see also Exhibit B to the October 24, 2019, letter from Bodine Perry, Exh. K. Plaintiff admits that Quinn and RTQ2 are distributed monies directly and for their benefit from B&T Expres revenue, but denies that they are paid on arm's length lease transactions, citing its responses at paragraphs 17, 21, 69, inter alia. [Doc. 138 at 18].

88. According to Plaintiff, Plaintiff has produced no evidence that either Quinn or RTQ2, or their sole member, Howard O'Malley, have any decision making in the management or control of B&T Express. Affiliated Defendants state, "[o]n the contrary, Anthony Traficanti is a

18

shareholder of B&T Express."  [Doc.138 at 18].

89. According to Affiliated Companies, Plaintiff has produced no evidence of record to support that either Quinn or RTQ2 receive or share in any profits from B&T Express. Plaintiff denies this, noting that B&T Express distributed Omco, Aljen, A.T.T., Quinn, and RTQ2 monies to pay debt amortizations on equipment each affiliate owned and monies that would otherwise have been a profit of B&T Express for which B&T Express would have tax liabilities, citing Pl.'s Ex. 13, 1, 15, 16, 17, and 18.

90. According to Affiliated Companies, Plaintiff has produced no evidence of record to support that either Quinn or RTQ2 share in any of B&T Express losses. Plaintiff admits she has not produced such evidence but notes that the tax records and accounting records do not show B&T Express ever had losses, and based on the manner of operating, if B&T Express had losses or no funds to distribute, Quinn and RTQ2 would have received no distributions and/or would have suffered the non-payment by B&T Express of equipment loan amortization, citing Pl.'s Exs. 13, 15, 16, 17 and 18.

91. According to Affiliated Companies, like Omco and Aljen, Quinn and RTQ2 were created to own and lease tractors and trailers so as to protect the personal assets of Howard O'Malley, who previously personally owned them. See pp. 33-34 of the D.T. of Perry, Exh. I. Plaintiff contends that on the contrary Quinn and RTQ2 "may serve as protection from personal liability for tortious conduct, each provides distinct benefits set forth in the opinion letter of John Lally, CPA, citing Pl.'s Exs. 1, 11, 28.

**B.  Defendant Cadillac's CSMF**

While defendant Cadillac joins in the CSMF on behalf of Affiliated Companies, it further sets forth the following Concise Statement of Undisputed Facts (ECF No. 123), to which plaintiff

has agreed or disputed, as follows:

1. Cadillac is an Indiana corporation, incorporated on November 4, 2009, and has its principal place of business at 86 N. Bridge Street, Gary, Indiana. *See* Answer of Cadillac to Plaintiff's Second Amended Complaint ("Cadillac Answer") [Doc. 73 ¶ 4].

2. Breen O'Malley and Thomas Cook are the shareholders of Cadillac. (Cadillac Answer ¶ 22.)

3. Cadillac was created to provide commercial drivers because Mr. O'Malley did not want B&T Express to have trucking employees so that B&T Express would not have to deal with unionization and any related issues. Mr. O'Malley testified that his father, who had been in the trucking business for many years, did not have a good experience with unions. (*See* Deposition of Breen O'Malley, pp. 16, 62 (Appendix to Motion for Partial Summary Judgment of B&T Express, et al. (ECF No. 119), Exhibit E; Deposition of Thomas Cook, p. 12, Appendix to Motion for Partial Summary Judgment of B&T Express, et al. (ECF No. 119, Exhibit G.)

4. According to Cadillac, B&T Express leased drivers from Cadillac. (*See* Response 4b of the October 24, 2019, letter from Bodine Perry, Appendix Motion for Partial Summary Judgment of B&T Express, et al. (ECF No. 119, Exhibit K.) Plaintiff denies that B&T Express leases drivers and equipment from Cadillac Transportation, though it does lease drivers and equipment who are owner-operators and not the other defendants.  According to Plaintiff, those drivers which B&T Express uses to drive the equipment of Omco, Amjen, A.T.T., Quinn, and RTQ2 are initially employed by Cadillac Transportation and assigned, not leased, to B&T Express for its use, for which B&T Express reimburses its affiliate, Cadillac Transportation, without any profit

realized by Cadillac Transportation which is an affiliate of the partnership of all the company defendants,  (citing Pl.'s App. Ex. 13 and 15).

5. According to Cadillac, Cadillac is paid by B&T Express for the lease of drivers. (See Response 4 of the October 24, 2019, letter from Bodine Perry (Doc. 119, Exhibit K). Plaintiff denies that drivers are leased, and notes "Cadillac is only reimbursed for what it pays drivers that are assigned to B&T Express solely for the reasons set forth in paragraph 3, which is why Cadillac exists, and as such was not in a lease transaction whereby Cadillac as a separate entity earns a profit or even intends to earn a profit."  (Doc. 139 at 2).

6. Plaintiff has produced no evidence of record that Cadillac receives of [sic] shares in any profits from B&T Express.

7. According to Cadillac, Plaintiff has produced no evidence of record that Cadillac shares in any of the losses of B&T Express. Plaintiff contends that although no such evidence exists, it denies that the use of Cadillac by the B&T Express transport business partnership will ever have losses because Cadillac is always and only reimbursed the amount of driver damages. (Doc. 139 at 2).

8. Cadillac filed corporate tax returns every year. (See U.S. Corporate Tax Returns of Cadillac for 2014 through 2017, Appendix to Motion for Partial Summary Judgment of B&T Express, et al. (Doc. 119, Exhibit M.)

9. The revenues reported on the tax returns of Cadillac have been reconciled with the cost of the leased drivers as identified in the tax returns for B&T Express. (*See* Response 4a and Exhibit A to the October 24, 2019, letter from Bodine Perry (Doc. 119, Exhibit K).

### C.  Plaintiff's CSMF[6]

---

[6] Cadillac's and Affiliated Companies' objections to Plaintiff's version of events may be repeated herein, but for the most part will be noted only to the extent they supplement those factual disputes not previously noted *supra*.  Their

1, 2, 4.  Plaintiff relies upon the testimony of Cook to establish the dates of incorporation, incorporators and/or officers, and the owners in each of defendant companies.  As explained in Affiliated Companies CSMF, the ownership of B&T Express and Affiliated Companies is:

> B&T Express: 50% of stock owned by Breen O'Malley;
> 25% of stock owned by Thomas Cook; and
> 25% of stock owned by Anthony Traficanti.
> Omco:        95% of the company owned by Breen O'Malley; and
> 5% of the company owned by Thomas Cook.
> Aljen:       5% of the company owned by Breen O'Malley; and
> 95% of the company owned by Thomas Cook.
> A.T.T.:      100% of the company owned by Anthony Traficanti.
> Quinn:       100% of the company owned by Howard O'Malley.
> RTQ2:        100% of the company owned by Howard O'Malley.

3.  According to Plaintiff, each shareholder contributed vehicle equipment to the common business enterprise.  Affiliated Companies deny this, stating no shareholder of B&T Express contributed or leased vehicle equipment to B&T Express.  Cook testified that *companies* separately owned by the shareholders of B&T express contributed equipment to B&T Express. (ECF No. 131 at 4, citing Cook Dep. at 31) (emphasis added).

5.  Omco and Aljen were created in September 2004 to own truck tractors and trailers that would be supplied to B&T and solely for the use of B&T.

6.  According to Plaintiff, RTQ2 and Quinn, owned solely by Howard O'Malley, Jr. and created in September, 2006 and ATT owned solely by Anthony Traficanti and created in October 2006 "had the purpose of owning truck tractors and trailers that would be supplied to B&T and solely for use by B&T."

7.  Cadillac was created in November 2009 and owned in equal shares by Breen O'Malley and Thomas Cook, and according to Plaintiff, were created for the sole purpose of

---

objections as to materiality will not be noted, as the Court's analysis will incorporate or implicitly reject or accept whether certain factual disputes are material to resolution of the pending motions.

hiring employed truck drivers who would be assigned to B&T Express so that B&T would not be an employer who could be a target of union organization.

8. According to Plaintiff, Logistics was created to employ managers, safety directors, clerks, dispatchers, and mechanics who worked in the B&T transport business and who constituted the non-driver staff of B&T.

9. Plaintiff contends all the defendant companies maintained the same address and used the facilities to conduct its business.

10. B&T did not own any vehicles or have any employees to conduct its business.

11. Breen O'Malley and Thomas Cook, who were the B&T officers, but not employees, conducted the day-today operations of the transport business.

12. B&T did not own any property and rented the building and open space on which trucks and trailers could be parked from Anthony Traficanti. Affiliated Companies explain that the property where B&T Express was located and which it rented was originally owned by Anthony Traficanti's father, Sam Traficanti, who was never a stockholder of B&T Express and further, since Sam Traficanti's death, Anthony Traficanti has personally owed the building, and B&T Express pays him rent. *See* pp. 5, 13, 17-18 of Anthony Traficanti's deposition transcript, Exh. 28 to Plaintiff's Appendix [Doc. 113-28].

13. B&T did not employ any drivers, clerical personnel, dispatchers, or mechanics or any other employees.

14. B&T is the only defendant entity with a Federal Motor Carrier Certificate of Authority and is assigned USDOT number 285442.

15. None of the Affiliated Companies who had truck tractors and trailers titled in their names used a certificate of authority and they did not operate a transport business.

23

16.  Affiliated Companies did not have truck drivers, clerks, managers, safety directors, or mechanics in their employ.

17.  According to Plaintiff, the Affiliated Companies who had vehicles titled in their names were associated with and contributed to the business of B&T by virtue of allowing B&T, through the employed drivers of Cadillac who were assigned to B&T, to have access and use, unlimited by time or conditions, of their respective truck tractors and trailers.

18.  The Affiliated Companies never leased or otherwise permitted any person or company other than B&T to use their vehicles and all the vehicles of those affiliated companies were painted with the colors, decals, logos, and the name of B&T identifying them to the public as a B&T vehicle.

19.  None of the Affiliated Companies ever asked for a return of any of its vehicles for other uses or applications and there was never any objection by an affiliate or the affiliate's owner (who was a B&T shareholder) to the way the vehicles were used by B&T.

20.  Messrs. O'Malley and Cook decided when a vehicle titled in one of the affiliates' name would be traded-in and a new vehicle purchased for that affiliate.  This was done not only for their personally owned companies, Omco and Aljen, but also for A.T.T., RTQ2, and Quinn. Affiliated Companies explain there is no evidence that O'Malley and Cook personally, or on behalf of B&T Express, were permitted to execute legal documents, including for sales or loans, on behalf of any of the Affiliated Companies.

21.  There is no evidence that A.T.T. made cash down payments for the financed purchase of vehicles titled in their name.

22.  According to Plaintiff, A.T.T. relied upon Messrs. O'Malley and Cook through B&T to handle all activities and decision-making for A.T.T., including making payments to finance

companies on A.T.T. truck loans. Affiliated Companies contend that although Anthony

Traficanti, the sole member of A.T.T., testified that A.T.T. used B&T Express' clerical staff, and

that B&T Express made the payments for the tractors and trailers, he did not testify that B&T

Express handled all activities and decision making for A.T.T. In fact, Mr. Traficanti noted that it

was A.T.T.'s obligation to pay any loans on the tractors and trailers it owned, although said

payments were made by B&T Express as part of the lease of the equipment. See p. 27 Anthony

Traficanti's deposition transcript, Exh. 28 to Plaintiff's Appendix [Doc. 113-28].

23.  B&T paid finance companies for all the vehicles of affiliates.  Affiliated Companies

explain that the payment was part of B&T Express' payment for the lease of them, citing pp. 41-

42 of Daniel Perry's deposition transcript, Exh. 26 to Plaintiff's Appendix [Doc. 113-26].

24.  OMCO and ALJEN became the finance obligor for some vehicles purchased for

Howard O'Malley and possibly A.T.T.

25.  With the permission of and cooperation of Anthony Traficanti, O'Malley and Cook,

negotiated the purchases of vehicles, and simply asked Mr. Traficanti, on behalf of A.T.T., to

sign the necessary documents.  A.T.T. then never took actual possession of the vehicles, which

were assimilated into the operations of B&T.  Affiliated Companies deny that A.T.T. simply

signed the necessary documents and note that Anthony Traficanti testified that he did participate

in the purchasing of tractors and trailers for A.T.T. Specifically, B&T Express, through Mr.

Cook or Mr. O'Malley, would approach Mr. Traficanti; advise him that A.T.T.'s trucks were

getting older; and indicate that they were going to trade them in and would handle the details, but

that at some point, A.T.T. would have to complete the credit application.

26.  B&T Express decided the state in which the vehicles of A.T.T. would be registered.

Affiliated Companies elaborate that A.T.T. permitted B&T Express to determine the state of

registration for its tractors and trailers.

27. MSJ Ex. 14 includes Cook Depo Exs. 8, 14 and 18 which are lists of vehicles titled in the name of the affiliates.

28. The testimony of Messrs. Traficanti and Cook set forth A.T.T.'s supply of vehicles.

29. The 2017 vehicle asset tally is as follows:

|  | ALJEN | OMCO | A.T.T. | RTQ2/Quinn 1 | B&T |  |
|---|---|---|---|---|---|---|
| Trucks | 45 | 42 | 17 | 11 | 0 | 115 |
| Trailers | 77 | 77 | 11 | 6 | 0 | 171 |
| Total | 122 | 119 | 28 | 17 | 0 | 286 |
| Share/Trucks | 39% | 36.5% | 15% | 9.5% | 0 |  |
| Share/Trailers | 45% | 45% | 6% | 4% | 0 |  |
| Share/Total | 42.7% | 41.6% | 9.7% | 6% | 0 |  |

30. All of the affiliate vehicle units were "contributed" to the B&T operations by each of the affiliates without drivers. Those units were driven by drivers employed by Cadillac and assigned to B&T, such as is the case with defendant Wells, the driver, on the day of the incident. Affiliated Companies dispute that the tractors or trailers were contributed to B&T Express.

31. B&T also operated with the service provided by "owner-operators", traditionally regarded as individuals or companies who owned vehicles and supply them with a driver to another motor carrier under a term or trip lease.

32. The owner-operators were paid 78 to 80% of the revenue invoiced by B&T to its customers. The payments were made to the owner-operator entities by B&T and designated "commissions" in its tax returns.

33. Despite B&T not having any vehicle units titled to it, B&T Express represented to the U.S. Department of Transportation and its casualty insurance company that it used term leased vehicle units and "owned" truck tractors and trailers, the number of which being "owned" units approximates the vehicle units contributed to the B&T operation by the affiliates.

26

Affiliated Companies deny that there was any intentional misrepresentation.

34.  In anticipation of having its casualty insurance renewed for the period 5-1-17 to 5-1-18, B&T Express represented in its Large Fleet Trucking Application to RLI Insurance Company that its "company owned and long term leased" vehicles included 96 truck tractors.

35.  MSJ Ex. 24 is the declarations page for the RLI Insurance policy for 5-1-17 to 5-1-18 issued to B&T Express as a named insured and the affiliates are additional insureds, but do not pay premiums (Perry DT 107-108) which were paid by B&T.

36.  MSJ Ex. 19 includes the only leases produced in discovery for ALJEN.  The unsigned trailer lease attaches a list of 46 trailers out of the 77 trailers titled in ALJEN.  There are 3 tractor leases covering only 10 truck tractors of the 45 titled in ALJEN.  Affiliated Companies clarify that Aljen could only locate written leases for some of the tractors and trailers.

37.  MSJ Ex. 20 includes the only leases produced in discovery for Omco.  The unsigned trailer lease attaches a list of 47 trailers out of the 77 trailers titled in Omco.  There are 3 truck tractor leases covering 3 truck tractors out of the 42 titled in Omco.  Affiliated Companies explain that Omco could only locate written leases for some of the tractors and trailers.

38.  MSJ Ex. 21 includes only 2 leases for 2 truck tractors titled in Quinn.

39.  49 CFR 376.11 and 376.12 require that a written signed lease specifying the time period of use and the payment for use of transport equipment leased by a certificated motor carrier from an owner of the equipment who is not a motor carrier and not the agent of the lessee in the same business.  Affiliated companies explain the requirement of a written lease is inapplicable to a trailer attached to a tractor that is leased from a different lessor. 49 C.F.R. § 376.21(d). Thus, to the extent that any of the trailers of a Defendant Affiliated Company were attached to a power unit owned by a different Defendant Affiliated Company, a written lease was

not required. Moreover, it is notable that there was a written lease between B&T Express and

A.T.T., the owner of the tractor being driven by Wells as the time of the accident. See ¶¶ 7-9 of

Defendants' Concise Statement of Material Facts in Support of their Motion for Partial Summary

Judgment [Doc. 120]. Although B&T Express was unable to locate a written lease between it and

the owner of the trailer, Traficanti Trucking, LLC, pursuant to 49 C.F.R. § 376.21(d), a written

lease was not required.

  40.  The combinations of truck tractor and trailer were mixed in the way that one affiliate

company's truck may have had another affiliate company's trailer attached to it.

  41.  Dispatchers at the various B&T terminals did not use any system to differentiate one

affiliate's vehicle units from another, and the units were mixed together without trying to balance

the use between or among the affiliates.  Affiliated Companies explain dispatchers did not know

who owned the equipment being used, and there was no preference for using equipment of

certain entities or using independent owners and operators. Loads were assigned by the

dispatcher based on the location of the load and the availability of the drivers and the equipment.

See ¶ 28 of Defendants' Concise Statement of Material Facts in Support of their Motion for

Partial Summary Judgment [Doc. 120].

  42.  According to Plaintiff, Mr. Cook assumed that each unit of an affiliate was being

used as much as another.  Affiliated Companies clarify Mr. Cook testified on page 42 of his

deposition that no truck was being used as much as another truck. See p. 42 of Thomas Cook's

deposition transcript, Exh. 11 to Plaintiff's Appendix [Doc. 113-11].

  43.  According to Plaintiff, Mr. Traficanti testified he was paid a flat fee of $5,000 per

week for his participation in B&T Express.  Affiliated Companies clarify Anthony Traficanti

never testified that he was paid for "his participation in B&T Express." Instead, Mr. Traficanti

was asked about the amount paid by B&T Express for "your participation <u>by trucks</u>." *See* p. 47

of Anthony Traficanti's deposition transcript, Exh. 28 to Plaintiff's Appendix [Doc. 113-28]

(emphasis added). This clearly was referencing the payment by B&T Express to A.T.T. for its

lease of tractors and trailers. Also, the reference to $5,000.00 a week was an example used by

Plaintiff's counsel during the deposition, and not the amount that Mr. Traficanti testified A.T.T.

was paid. *Id.*

      44.   An affiliate whose titled vehicles were used in the B&T transport business were not

paid a certain percentage of invoiced revenue from a load, even though a lease providing for

such percentage to be inserted had existed.  Affiliated Companies explain they were paid a set

weekly or monthly amount, calculated by the number of tractors or trailers being leased to B&T

Express, along with the third-party debt payments associated with the leased equipment.

      45.   None of the leases of B&T with affiliates had a percentage written in the space

provided in the leases.  The leases in MSJ 19, 20, and 21 had an open-ended period of use of the

vehicle unit without a payment indicated.

      46.   Omco and Aljen answered First Requests for Production that it did not keep records

to determine what compensation was paid for the use of each of its vehicles by B&T.  Affiliated

Companies clarify B&T Express did keep track of the number of tractors and trailers which it

was leasing from Omco and Aljen, and properly identified the payments to Omco and Aljen in

B&T Express' financial documents, including its Federal Income Tax Returns, and further,

Omco and Aljen also properly filed Tax Returns identifying income received from B&T Express.

      47.   Daniel Perry, CPA, the accountant for B&T as well as Cadillac, Omco, and Aljen,

testified that A.T.T., Omco and Aljen were paid a flat fee regardless of specific trips or

transactions and were not paid on the basis of a percentage of revenue from a delivered load.

48.  MSJ Ex. 13, the letter of Daniel Perry, CPA, agreed to be provided as a supplement to Mr. Perry's testimony, (Perry DT 101, 105, 114, 117) indicates in "Response 5" that B&T paid the finance companies directly for all loans associated with vehicles of all the affiliates. Affiliated Companies clarify this was part of the compensation they received for their leases with B&T Expres.

49.  The documents provided by tax returns for B&T Express, Omco, Aljen, and Howard O'Malley with the explanation letter of Daniel Perry, CPA provide how monies were disbursed from B&T to the affiliates and the amounts disbursed.  (MSJ Exs.13, 15, 16, 17, 18).

50.  The 2017 distributions to affiliates listed in the Perry letter were as follows:

| | OMCO | ALJEN | ATT | RTQ2/QUINN 1 | TOTAL |
|---|---|---|---|---|---|
| B&T Form 1120 | 1,327,885 | 1,359,237 | 650,778 | 329,450 | 3,667,440 |
| Share | 36.2% | 37.1% | 17.7% | 9% | |

(MSJ Ex. 13)

51.  All the affiliates maintained the same address as B&T and any office transactions would have been done by clerical staff, operations manager paid by Logistics by B&T or Messrs. O'Malley and Cook in that office space in the building rented by B&T from Mr. Traficanti. Affiliated Companies explain Anthony Traficanti further testified that A.T.T.'s documentation was in his possession, in his office, and under his control; B&T Express did have access to it and Mr. Traficanti allowed this. *Id*. at pp. 44-45.

52.  Logistics by B&T employed the mechanics which serviced the vehicles titled in the name of the affiliates and used in the B&T transport business.

53.  Thomas Cook testified that he and Breen O'Malley did not want employees in order to avoid unionization.

54.  In 2004, Messrs. Cook and O'Malley planned to buy vehicles and then use them in B&T Express but did not title them in the name of B&T Express because they wanted to "keep it all separate."

55.  There was an agreement among all of the affiliates (Omco, Aljen, A.T.T., RTQ2 and Quinn) and B&T that each affiliates' vehicles would be used for an unlimited period by B&T Express who would supply drivers assigned to it from Cadillac. Affiliated Companies clarify that  there is no evidence that there was any agreement between B&T Express and the Defendant Affiliated Companies that the leased tractors and trailers would be driven by Cadillac employees or that the Defendant Affiliated Companies had any say in who drove the tractors and trailers. They also contend Plaintiff also has presented no facts of record to support that any of the Defendant Affiliated Companies had an agreement with B&T Express as to who exactly would be permitted to operate the leased tractors and trailers.

56.  None of the affiliate entities ever objected or asked for a vehicle to be returned to it.

57.  There was a tacit agreement and understanding among all the affiliates and B&T that B&T Express would operate as it had during the years 2011 to 2017.  A.T.T. and Quinn were always agreeable with the arrangement and never objected.

58.  Between 2011 and 2017, B&T and the Affiliates functioned in the same manner. Affiliated Companies respond to Plaintiffs CSMF 57 and 58, "it is denied that Plaintiff has produced any evidence whatsoever that the Defendant Affiliated Companies had a tactic agreement or any right to control or make decisions as to the operation of B&T Express."

59.  The creation and existence of the affiliated companies were used by the shareholders of B&T to avoid corporate taxes, taxes on earned income, get the benefit of expanded depreciation and tax deductions, and allowed Messrs. Cook and O'Malley to be distributed

73.3% of the distributions paid by B&T instead of being distributed taxable earned income or only 50% of dividends. Affiliated Companies clarify that Daniel Perry suggested their creation to protect them from personal liability associated with leasing tractors and trailers that may be involved in accidents.

60. The manner of operation in the business relationship between B&T and the affiliated was substantively not an arms-length relationship between companies conducting leasing transactions. Affiliated Companies object to this statement, as it reiterates allegations in the Second Amended Complaint rather than the record.

61. The Appendix incorporated by reference to this Concise Statement of Facts includes exhibits MSJ 1 through 32 listed on the Appendix and filed.

## II.  Standard of Review

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Once the moving party satisfies

its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

Courts treat cross-motions for summary judgment as if they were distinct, independent motions, and must rule on each party's motion on an individual and separate basis. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008); *Richman & Richman Real Est., LLC v. Sentinel Ins. Co., Ltd.*, No. 2:16-CV-1855, 2017 WL 4475963, at *2 (E.D. Pa. June 13, 2017), citing *Beneficial Mut. Sav. Bank v. Stewart Title Guar. Co.*, 36 F.Supp.3d 537, 544 (E.D. Pa. 2014).

### III.  Discussion

At the outset, we note the following.  First, although portions of the briefing were dedicated to the issue of whether summary judgment should be entered as to Plaintiff's pursuit of

an alter ego theory, such theory has been withdrawn by Plaintiff.  (ECF No. 140 at 2).  Second, Defendant Cadillac has joined in the other defendant's briefing, in addition to providing its own brief and arguments in support of its motion.  (ECF No. 143).  Third, the parties agree that the applicable law as to joint ventures and partnerships is the same, and that because this case was removed from state court, Pennsylvania's choice of law rules apply, and further, when applied, there is no conflict between Ohio and Pennsylvania law with respect to joint ventures. See Pl.'s Br. in Supp. of M.P.S.J. (ECF Nos. 121 at 12, 140 at 2); *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011).

### A. Affiliated Companies' Motion

Plaintiff contends that the defendants were a joint venture or partnership.   Once a party satisfies the test for a joint venture, the torts committed by one joint venturer may be imputed upon other joint venturers. *See Beavers v. West Penn Power Co*., 436 F.2d 869, 873 (3rd Cir. 1971); *Friedman v. Wilson Freight Forwarding Co*., 181 F. Supp. 327, 329 (W.D. Pa. 1960).

Pennsylvania defines a joint venture as an "association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." *Corporate Aviation Concepts, Inc. v. Multi–Service Aviation Corp*., No. 03–3020, 2004 WL 1900001, *6 (E.D. Pa. Aug.25, 2004) (citation omitted). The elements of a joint venture are:

> 1. Contribution to the joint venture by each member, which can be services, skills, knowledge, materials, or money;
>
> 2. Sharing of profits among the parties;
>
> 3. A joint proprietary interest and right of mutual control over the subject matter of the enterprise; and
>
> 4. Usually, a single business transaction rather than a general and continuous transaction.

*McRoberts v. Phelps*, 391 Pa. 591, 138 A.2d 439, 443–44 (Pa.1958).[7]

A "[j]oint venture is an amorphous legal doctrine" and we are not to interpret these factors too strictly when determining whether a joint venture exists. *Streamline Business Servs., LLC v. Vidible, Inc*., No. 14–1433, 2015 WL 3477675, *3 (E.D. Pa. June 2, 2015) (quoting *Beavers v. West Penn Power Co*., 436 F.2d 869, 872 (3d Cir.1971)); *see also FFR SE, LLC v. Sanborn*, No. CIV.A. 14-5439, 2015 WL 3970923, at *8 (E.D. Pa. June 30, 2015).

A joint venture resembles in many ways a partnership, the principal difference being that it usually, though not necessarily, applies to a single transaction instead of being formed for the conduct of a continuing business. *Snellbaker v. Herrmann*, 315 Pa. Super. 520, 526–27, 462 A.2d 713, 716 (1983), citing *West v. Peoples First National Bank & Trust Co*., 378 Pa. 275, 281–282, 106 A.2d 427, 431 (1954).  Similar to the definition of a joint venture, a partnership [8] exists where there is "[1] an express or implied partnership contract between the parties; [2] the sharing of profits and losses; [3] mutuality of agency; [4] mutuality of control; and [5] co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds." *Grendell v. Ohio Env't Prot. Agency*, 146 Ohio App. 3d 1, 13, 764 N.E.2d

---

[7] Under Indiana law, which applies to defendant Cadillac, the law is the same. As explained in *Linares v. El Tacarajo*, 119 N.E.3d 591, 600 (Ind. Ct. App. 2019):

"[a]s in a partnership, the parties to a joint venture are jointly and severally liable." *DLZ Indiana, LLC v. Greene Cty.,* 902 N.E.2d 323, 330 (Ind. Ct. App. 2009). A joint venture is "an association of two or more persons formed to carry out a single business enterprise for profit." *Robbins v. Trustees of Indiana University,* 45 N.E.3d 1, 6 (Ind. Ct. App. 2015). In a joint venture, "the parties must be bound by an express or implied contract providing for (1) a community of interests, and (2) joint mutual control, which is an equal right to direct and govern the undertaking that binds the parties to the agreement." *Id*. A joint venture agreement also must provide for sharing of profits. *Id*. A joint venture is similar to a partnership, except a joint venture contemplates a single transaction. *Id.*

[8] Under Ohio law, a joint venture is a partnership established for the purposes of a single business enterprise. *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir.1996). The essential elements of a joint venture partnership are: 1. a joint contract; 2. an intention to associate as joint venturers; 3. community of interest and control, including contributions to the joint venture; 4. the mutual right to direct and control the purpose of the joint venture; and 5. an agreement for the division of profits and losses-jointly, not severally. *Lester v. Wow Car Co*., No. 2:11-CV-850, 2013 WL 6058676, at *3 (S.D. Ohio Nov. 14, 2013), aff'd, 601 F. App'x 399 (6th Cir. 2015), citing *Blessing v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 244 F. App'x 614, 619 (6th Cir.2007)

1067, 1077 (2001), citing *Anchor v. O'Toole,* 94 F.3d 1014, 1024 (6th Cir. 1996).

A joint venture is not a status created or imposed by law; it is a relationship voluntarily assumed and arising wholly from contract. 2 Williston on Contracts 557, § 318A (3rd ed. 1959). Whether persons have engaged in it must depend primarily upon their intention as expressed in their agreement and the construction they have placed upon it.  *Snellbaker v. Herrmann*, 315 Pa. Super. 520, 526, 462 A.2d 713, 715 (1983).  The element of "profit sharing" in a joint venture requires that the profits be joint and not several. *Digital Encoding Factory, LLC v. Iron Mountain Info. Mgmt., Inc.*, 660 F. Supp. 2d 608, 617 (W.D. Pa. 2009), citing *In re Computer Personalities Sys., Inc.*, 284 B.R. 415, 421, 423 (Bankr. E.D. Pa. 2002) (concluding that profits were not shared where one party received payments based on percentage of gross charges collected by the other and, accordingly, "one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss").

After a careful review of the record evidence, we find that the Affiliated Companies have shown there is no genuine dispute of material fact as to an alleged joint venture.   The first element of a joint venture is a contribution by each party of effort, knowledge, skill or other asset to the common undertaking.  "A contribution is given to the enterprise, with no guarantee of return. . . . Return of the contribution is made through profits, if there are any." *Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc*., No. CIV.A. 92-4228, 1993 WL 514496, at *4 (E.D. Pa. Dec. 1, 1993), citing *Snellbaker v. Herrmann,* 462 A.2d 713 (Pa. Super.1983).

The Affiliated Companies have shown that there is no genuine dispute that they were paid for leasing personnel, mechanics, drivers, tractors, and trailers.  Payment for tractors and trailers was based on the number being leased from each entity, and the condition or age of the tractors or trailers, and the payments were accounted for in B&T Express' income tax returns.

There is no genuine dispute of material fact that the Affiliated Companies did not have a right to share in the profits or an obligation to share in the losses of B&T Express. While Affiliated Companies were paid for the leasing arrangement, in the form of finance payments and a fee, they did not share in any profit and there is no record evidence they were liable for B&T Expresses losses. And there is no record evidence which could support a claim that the leasing of employees or drivers was below market value.

In opposing the affiliated Companies' motion, Plaintiff asserts there is no genuine dispute of material fact with respect to the following: 1) there were no leases between the Affiliated Companies and B&T Express for tractors and trailers, and thus, any payment by B&T Express for the use of this equipment was a distribution of profits; 2) there is evidence of mutual control because the shareholders of B&T Express owned the Affiliated Companies.

First, Plaintiff attempts to show that there were no leasing arrangements between Affiliated Companies and B&T Express, but rather, that the provision of personnel, as well as tractors and trailers were "contributions."  As to the first point, defendants concede the applicable motor carrier regulations may require written leases for tractors, however, the parties' leasing arrangement herein is neither unenforceable nor is it evidence of profit-sharing.  The entities that leased equipment to B&T Express were either paid a set weekly or monthly amount, or a percentage of the load; B&T Express also paid the third-party debt payments associated with the leased equipment. The corporate tax returns for B&T Express reflect its payments to the Affiliated Companies. Plaintiff admits she has produced no evidence to support that the Affiliated Companies receive or share in any profits from B&T Express, but instead she characterizes the arrangement whereby B&T distributed monies to pay debt on equipment as "monies that would otherwise have been a profit of B&T Express for which B&T Express would

have tax liabilities [Doc. 138 at 16-17]. This is not the same as sharing in profits.  The element of "profit sharing" in a joint venture requires that the profits be joint and not several. *See, e.g., In re Computer Personalities Sys., Inc.*, 284 B.R. 415, 421, 423 (Bank.E.D.Pa.2002) (concluding that profits were not shared where one party received payments based on percentage of gross charges collected by the other and, accordingly, "one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss"); *In re PCH Assocs*., 949 F.2d 585, 599 (2d Cir.1991) (applying Pennsylvania law and concluding that joint venture requires share in the net profits, i.e., total revenue minus expenses). In viewing the facts and drawing inferences in the light most favorable to non-moving party plaintiff, she has not met her rebuttal burden in this regard and accordingly, the motion for partial summary judgment will be granted as to Affiliated Companies.

Plaintiff has also failed to rebut the defendants showing that there is no genuine dispute of material fact as to another element as to a joint venture theory:  joint proprietary interest and right of mutual control over the subject matter of the enterprise. Plaintiff's primary argument is that certain of the Affiliated Companies had individuals who had shareholder interests in B&T Express, as well as an ownership interest in an Affiliated Company. From these facts Plaintiff extrapolates that there was mutual control between B&T Express and the Affiliated Companies. For example, even though Breen O'Malley owned 95% of Omco, and was a 25% stockholder of B&T Express, this does not mean that Omco had any proprietary interest in B&T Express. We cannot ignore these corporate forms[9] which are evident in the record, and there is no genuine

---

[9] In *Minno v. Pro-Fab, Inc*., 121 Ohio St.3d 464, 905 N.E.2d 613 (Oh.2009), where a plaintiff employee, who alleged serious injury was incurred as a result of unsafe work conditions, sued his employer (who carried no general liability insurance) plus a related corporation (which carried this insurance), no individual claims were made against the shareholders. Plaintiff therein sought "to impose liability upon a corporation that holds no ownership interest in the corporation that allegedly committed the wrongful acts." *Id.* at ¶ 12. The Court explained: "Any wrongful act committed by one sister corporation might have been instigated by the corporation's owners, but it could not have been instigated by the corporation's sister." *Id.*

dispute in that regard. A party "cannot use the joint venture theory as an end-run around the burdens imposed on a party seeking to disregard the corporate form." *North Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*, 515 Fed. Appx. 176, 181 n. 11 (3d Cir. 2013).

For these reasons, the motion for partial summary judgment filed on behalf of the Affiliated Companies is granted as to the joint venture claim.

**B.  Cadillac's Motion**

Cadillac, which was the employer of the driver Wells is a separate Indiana corporation that leased drivers to B&T Express.  It has also filed a motion for summary judgment on Plaintiff's joint venture claim.  The record evidence demonstrates that Cadillac is a wholly separate entity, incorporated under the laws of Indiana.  The parties are in agreement that the law as to joint ventures is the same in Indiana as it is in Ohio and Pennsylvania (ECF No. 124 at 3, ECF No. 140 (citing Pennsylvania and Ohio law)), and accordingly, our analysis is the same with respect to whether plaintiff's cause of action can proceed under a joint venture theory as to Defendant Cadillac.  We find that it cannot.

There is no dispute that -- as with the Affiliated Companies -- Cadillac is a separate entity from B&T Express and the other defendants, files its own tax returns, provides drivers to B&T Express, is reimbursed by B&T Express for the use of the drivers, and there is no evidence of profit sharing or sharing in B&T Express' losses. *See Walker v. Martin*, 887 N.E.2d 125, 138 (Ind. Ct. App. 2008) (holding that parties were not engaged in a joint venture because they did

---

Thus, we hold that a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation. A corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation. Despite the element of common shareholder identity, sister corporations are separate corporations and are unable to exercise control over each other in the manner that a controlling shareholder can. This lack of ability of one corporation to control the conduct of its sister corporation precludes application of the piercing-the-corporate-veil doctrine.

*Id*. at ¶ 13.

not share in any profit from the sale of logs, although one party paid the other per load based on miles traveled or per board feet of wood hauled); *Inland Steel v. Pequignot*, 608 N.E.2d 1378, 1382 (Ind. Ct. App. 1993) (holding that a contract for steel shipments at predetermined rates is not profit sharing for purposes of establishing a joint venture).  Plaintiff admits she has produced no evidence of record to support that Cadillac shares in any of B&T Express losses, but argues instead that the use of Cadillac by the B&T Express transport business will never have losses, because Cadillac is always and only reimbursed the amount of driver earnings. This does not suffice; between the joint venturers there must be a sharing of the profits and the losses jointly, not severally. Cadillac did not contribute to the assets of the other entities, nor is there evidence of a right to control or bind the other defendants. Plaintiff has not rebutted this evidence.  And while there may be commonality of ownership, as Cadillac aptly notes, this "is insufficient to support a finding of a joint venture to defeat corporate separateness." *Byrd v. E.B.B. Farms,* 796 N.E.2d 747, 754 (Ind. Ct. App. 2003). The fact that two or more parties agree to work "jointly and in collaboration" or "collectively" does not necessarily mean that they are engaged in a joint venture. *DLZ Indiana, LLC v. Greene Cty.*, 902 N.E.2d 323, 329 (Ind. Ct. App. 2009).

Accordingly, because there is no genuine dispute of material fact as to Cadillac's participation in a joint venture, its motion for summary judgment will be granted.

### C.  Plaintiff's Motion

Although this Court's analysis of Plaintiff's motion for summary judgment will mirror our previous analysis of the Affiliated Companies' and Cadillac's motions, this Court separately analyzes Plaintiff's cross-motion for summary judgment. *See Lawrence,* 527 F.3d at 310. Viewing the facts in the light most favorable to Plaintiff, the Plaintiff has not shown a lack of genuine dispute of *material* fact as to the joint venture theory.  In particular, there is no genuine

dispute as to these purported joint venturers having the right to direct or the authority to control the purpose of the joint venture, or an agreement for the division of the profit and loss. Accordingly, Plaintiff's cross-motion for partial summary judgment is denied.

## IV.  Conclusion

For the reasons stated herein, Plaintiff's motion for partial summary judgment will be denied, the motion for partial summary judgment on behalf of the Affiliated Companies will be granted and Cadillac's motion for partial summary judgment will be granted.

An appropriate order will be entered.

Dated:  March 22, 2022                     /s/ *Robert J. Colville*
                                                        Robert J. Colville
                                                        United States District Court Judge

cc: all counsel of record *via CM/ECF electronic filing*

41