**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEBORAH H. WILKOSKI | ) |
| Administratrix of the Estate of Zachary | ) |
| J. Wilkoski, Deceased, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  C.A. 18-1359 |
| B&T EXPRESS, INC., a corporation, | ) |
| CADILLAC TRANSPORTATION, | ) |
| INC., a corporation, | ) |
| | ) |
| Defendants. | ) |

<u>**MEMORANDUM OPINION**</u>

Presently pending before the court is Defendants' Motion for Partial Summary Judgment as to Plaintiff's Decedent's Conscious Pain and Suffering Claim. (ECF No. 180). For the reasons stated herein, the motion will be denied.

**I.  Procedural and Factual Background**

Plaintiff asserts various claims of negligence against defendants B&T Express, Inc., Cadillac Transportation, Inc., and former defendant Arthur Wells. B&T Express has admitted that Wells was driving the tractor-trailer on its behalf and under its DOT operating authority. B&T Express and Cadillac also have admitted that Wells was negligent and caused the accident, while Wilkoski was not negligent in causing the accident. Therefore, the only issues in this case are causation and damages. As to damages, Plaintiff seeks to recover for Plaintiff's decedent's conscious pain and suffering between the time of the impact/injuries and his death. (Second Amended Complaint, ECF No. 46 at ¶51). Plaintiff has stipulated that her claim for punitive damages has been withdrawn and she will only be seeking compensatory damages. (ECF No.

135).

On June 30, 2022, Defendants moved for partial summary judgment on this issue, arguing there is no genuine dispute as to any material fact to support the claim that Wilkoski was conscious, and experienced any pain or other sensations, between the moment of impact, i.e., when he was injured, and the time of death. (ECF No. 180).  The trial in this matter is currently scheduled for November 7, 2022.  The matter has been fully briefed and is ripe for disposition.

The following facts are not in dispute.[1] On December 6, 2017, at approximately 4:50 p.m., Plaintiff's decedent, Zachary Wilkoski ("Wilkoski"), and Arthur Wells ("Wells"), were involved in a motor vehicle accident on State Route 28 south, in the Township of O'Hara, about ½ mile east of Exit 6 at the Highland Park Bridge, in Allegheny County, Pennsylvania.  At that time, Wilkoski was driving a 2016 Ford Mustang westbound on Route 28 and had stopped due to traffic being stopped ahead. At about the same time, Wells, who was driving a tractor with a trailer/flatbed ("tractor-trailer") westbound, failed to timely see the stopped traffic, and struck Wilkoski's car from behind, causing the accident. Wilkoski died as a result of the injuries he sustained in the accident, two days later, on December 8, 2017.

There were multiple witnesses at the scene of the accidentd. The parties obtained deposition testimony of two witnesses, Josh Stanisha ("Stanisha") and Kaitlyn Hoysan ("Hoysan"), who were among the first to get to Wilkoski and observe him following the accident.  Stanisha provided a Statement Under Oath ("statement") to counsel for Plaintiff.  Init he stated the following.  Shortly before the collision involving Wilkoski's vehicle, the traffic in front of Stanisha had come to an abrupt stop.  Stanisha turned the wheel of his vehicle to avoid colliding with the vehicle in front of him, pulling over to the right and colliding with the

---

[1] These facts are derived from Defendants' Concise Statement of Undisputed Material Facts (ECF No. 182) and Plaintiff's Counterstatement of Undisputed Material Facts (ECF No. 189).

guardrail, and eventually coming to a stop in the right-hand breakdown lane.  A few seconds later, Stanisha observed from his driver's side mirror Wilkoski's vehicle, which was at a stop behind another vehicle, getting rear-ended by the B&T Express truck, causing Wilkoski's vehicle to then collide with Stanisha's vehicle; the collision from Wilkoski's vehicle caused the airbag in Stanisha's vehicle to deploy.

Stanisha estimated that from the point of impact, it took about "[t]wo-three seconds" for the vehicles to come to rest.  Stanisha said he remained in his car in "shock" for a period of time; he did not know "if it was 5 seconds or 15 seconds. I really can't say." After the airbag in Stanisha's vehicle deployed, it took him about 20 seconds after the impact to get out of his own vehicle; walk over to Wilkoski's vehicle; look into the passenger side and observe Wilkoski (for about 10-15 seconds); get over the guardrail; and then walk to the driver's side of Wilkoski's vehicle. Based upon Stanisha's own testimony, the total time lapse from the moment of impact from the collision, to the time Stanisha observed Wilkoski, was greater than 25 seconds.

When Stanisha arrived at Wilkoski's vehicle, there were already other persons there looking into the vehicle's windows trying to get Wilkoski's attention.  Stanisha stated he observed Wilkoski for this time period. Assuming that Stanisha was able to complete everything he stated he did in 20 seconds after impact, according to Plaintiff's experts, Wilkoski would have become unconscious before Stanisha arrived at the vehicle. Wilkoski's injuries, including his diaphragm becoming paralyzed, occurred when he hit his head. If not rendered unconscious instantly from hitting his head, Wilkoski would have become unconscious between 10 and 15 seconds after his brain was deprived of oxygen due to his diaphragm becoming paralyzed.  Thus, according to the opinions provided by Plaintiff's own experts, Stanisha could not have observed conscious movement by Wilkoski at the scene.

In his statement, Stanisha described Wilkoski as being reclined back in the driver's seat and his body was "sort of like a writhing or just sort of a motion of the body" and "[i]t seemed sort of like a roll, like a side-to-side roll." Stanisha did not hear Wilkoski say anything. Stanisha clarified during his statement that he did not know if Wilkoski's movements showed any intent to move. Stanisha further stated that Wilkoski's eyes were closed and he did not seem to be responding. Stanisha witnessed Wilkoski's body movement for about 10-15 seconds. During Stanisha's subsequent deposition, he testified that when he looked into Wilkoski's vehicle, he saw:

> A. I guess the seat – it seemed as though he was laying back. I don't know if the seat broke the mechanism or whether that holds it up, but he was back and he seemed to – there seemed to be some form of something, some motion, I can't remember the exact kind of -- it wasn't really a conscious gesture or anything like that.
> Q. Whatever the motion was, can you tell me -- I apologize for having to ask this, I am sure it is difficult for you to tell us about this, but it's important to us. Can you tell us what parts of his body or singular part of his body was moving?
> A. So, it would be hard to tell, because I think his head came to a rest, sort of, turned to the right, so, if there was any movement – if it was shoulders, I wouldn't know if it was left or right really because there was a twist to it.
> Q. Could you see his eyes at that point?
> A. I believe they were closed.
> Q. Was he making any noises?
> A. I'm not sure. I seem to recall but I can't be sure now if I actually heard him making noise or if I am just remembering. It is hard for me to tell at this point.

Stanisha testified that he observed Wilkoski for "at most 20 seconds" through the passenger window of Wilkoski's vehicle, before he stepped away from the vehicle to call 911. In his statement he described the body movement as a "squirm." (ECF No. 182-1 at 88). After Stanisha called 911, he later observed Wilkoski from the driver's side of Wilkoski's vehicle, and did not "recall seeing any movement from him from that side." Stanisha testified that the police and fire department arrived, and he did not have any further close contact with Wilkoski after that time.

4

Hoysan, who is a nurse anesthetist, was the other witness who observed Wilkoski soon after the accident.  At the time of the accident, Hoysan was attending the University of Pittsburgh for her Masters' degree in nurse anesthesia, which she obtained in April 2018.  Hoysan did not see the collision between Wells and Wilkoski occur; as she approached the scene of the accident, she pulled over. Hoysan went to the driver's side of Wilkoski's vehicle and saw that "his window was down about two to three inches and I looked inside and he was just sitting there with his eyes open but not responding." Hoysan asked him, "hey, hey, are you okay?", but there was "no response from him, no movement or nothing."  Hoysan then entered Wilkoski's vehicle through the passenger's side door "and he was still unresponsive." Hoysan said that she "put my hand on his pulse and he did have a weak pulse but no breathing, but a weak pulse." Hoysan further testified that Wilkoski was slumped back in the driver's seat, and his body was stationary. According to Hoysan, there never was a point in time when she saw Wilkoski respond or appear to be conscious.

The decedent was transported to Allegheny General Hospital, after being resuscitated and intubated.  He was diagnosed with C3/4 fractures, C7 burst fracture, multiple transforamen fractures, T2 and T3 compression fractures,  scalp injury, bilateral C3/4 vertical occlusions, and no intracranial hemorrhage.  (ECF No. 189-1 at 88-89). His family pursued organ donation (*Id.* at 117), and he died on December 8, 2017.  The cause of death was listed as blunt impact injuries of the neck.  (*Id.* at 123)

Plaintiff's evidence in support of conscious pain and suffering includes a biomechanical report and deposition testimony of Andrew Rentschler, Ph.D., and expert report and deposition testimony of Todd Lukasevic, DO, an anatomic and forensic pathologist.[2]   Defendants argue

_____

[2] Plaintiff has stated that Alexander Yu, M.D. a neurosurgeon, will not be called as a witness (ECF No. 190 at 6), although in her surreply brief she addresses numerous arguments made by defendants as to Dr. Yu's opinions,

Plaintiff's experts are not qualified to render opinions on whether Wilkoski experienced conscious pain and suffering and that their conclusions are speculative, rather than being based on facts in the record.

Rentschler has provided an opinion as to the movement of Wilkoski's body at the time of impact with the tractor-trailer and the injuries he sustained. At the time of the impact, Wilkoski's vehicle was stopped, and the tractor-trailer behind him was traveling at a speed of 44 mph. According to these speeds, and Rentschler's calculations, the Delta-V (change in velocity) for Wilkoski's vehicle would have been about 40.7 mph, which means that when it was struck, it went from being stopped, to accelerating up to a speed of about 40 mph. The impact, which caused Wilkoski's vehicle to immediately accelerate to approximately 40 mph, caused the vehicle to be pushed forward, while at the same time, Wilkoski's body would have been pushed backwards into his seat. As the vehicle was being pushed forward, and Wilkoski's body was traveling backward relative to his vehicle, the seat failed, so that Wilkoski's body ramped "up the rear of [the] seatback" resulting in his head coming into contact with either the second-row seat or the roof of the vehicle.

Rentschler testified that these injury mechanisms were consistent with the focal trauma to his head; the compression and hyperflexion (chin to chest) of the cervical spine and the severe comminuted fractures of C3, C4 and C7, which compromised his spinal cord and vertebral arteries from C1 through C4; and the thoracic injuries, including the T3 compression fracture and the T2, as well. Rentschler testified that he is not a medical doctor; he has no training in neurology, neurosurgery, or orthopedics. Rentschler testified that he is not offering any medical

including that, assuming decedent was a quadriplegic at the time of impact, he could have spinal cord sensation,  the writhing by decedent observed by witnesses implied a less rhythmic stereotypical movement indicative of some response to the world, and that he believed there was some amount of time of suffering, but if he had to estimate, it would have been "minutes."

opinions in this case.  Rentschler testified that he had not reviewed the report of Plaintiff's expert

Todd Luckasevic, D.O., nor the report of Defendants' expert, David S. Zorub, M.D.

Defendants' neurosurgery expert, David S. Zorub, M.D., has opined that Wilkoski did not

experience conscious pain and suffering and that he was unconscious from the immediate

impact.  In the briefing on the pending motion, Plaintiff does not directly challenge his

conclusions.

Plaintiff has also offered the opinion of Todd M. Luckasevic, D.O., a forensic pathologist

with the Allegheny County Medical Examiner's Office. Luckasevic authored a report dated

August 1, 2019, in which he opined that Wilkoski "experienced at least 10 to 15 seconds of

conscious pain and suffering." Luckasevic offered an opinion that after the impact, and during

the "injury sequence" set forth by Rentschler in his report, "Wilkoski experienced conscious pain

and suffering." As a forensic pathologist, Luckasevic performs autopsies; he has never worked as

a treating physician. During his deposition, Luckasevic testified that Wilkoski lost consciousness

no more than 10-15 seconds from the time he sustained his cervical injuries, upon impact with

the rear seat or ceiling of the vehicle.  He testified that the only injury mechanisms in the

evidence are paralysis of the diaphragm and vertebral artery occlusion, both of which prevent

breathing after which the decedent would be conscious.  Thus, according to Luckasevic, by the

time Stanisha arrived at Wilkoski's vehicle and made his observations, Wilkoski would have

already lost consciousness. According to Luckasevic, Wilkoski lost consciousness due to the lack

of blood flow to his brain from the vertebral arteries and from the paralysis of the diaphragm

from the high cervical injuries. After decedent's body or head struck the roof or seat, he suffered

pain from the injury of vertebral fractures and scalp laceration while conscious for 12 to 15

seconds.

As far as the movement by Wilkoski that Stanisha observed, Luckasevic testified "there's no way to tell if those were just agonal, you know, kind of guarding movements or if they were purposeful movements." When Luckasevic was asked how he knew that Wilkoski was not immediately rendered unconscious when he hit his head on the seat or vehicle roof, Luckasevic testified there were no CT scans or other diagnostic studies performed that showed a cerebral contusion or small subarachnoid hemorrhage. He admitted that he did not know whether it is possible for someone to be rendered unconscious without any brain trauma showing up on CT scans or other diagnostic studies:

> Q. Okay. And when you said there was no sign of any brain injury from those records, that's why I'm asking you these questions. Is it possible that a blow to the head could knock someone unconscious and it's just not diagnosable based on the state of medical technology?
> A. I really can't answer that question because I don't see live patients and I'm not versed on medical technology available at trauma centers. So my answer would be anything is possible, but I can't answer it any further than that.
>
> *   *   *
>
> Q: Is it fair to say that you can't testify one way or the other whether he was knocked unconscious by the head injury, correct, or the head – whatever happened to his head, whatever occurred to him in terms of consciousness or unconsciousness, you can't testify?
> A. I can't testify, but there's no injury supporting a brain injury.
> Q. So the laceration is not an injury?
> A. Is not an injury to the brain, correct.
> Q. It's an injury to his head?
> A. To his scalp, yes.
> Q. So he must have hit his head on something?
> A. Most definitely.

Luckasevic further admitted that it is "possible" that Wilkoski "sustain[ed] spinal cord shock potentially from the fracture . . . a neurologist would be someone better to answer that question. . . . I don't know if I can diagnose that as a forensic pathologist." Luckasevic further testified that he could not opine whether the flexion injury and fractures Wilkoski sustained

resulted in a direct injury to his spinal cord, because "an autopsy would be the definitive way to tell." No autopsy was performed on Wilkoski.

## II.  Standard of Review

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## III.  Discussion

The Pennsylvania Survival Act, 42 Pa.C.S. § 8302, provides that "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff ....“ Additionally, 20 Pa.C.S. § 3373 states, "[a]n action or proceeding to enforce any right or liability which survives a decedent may be brought by or against his personal representative alone or with other parties as though the decedent were alive."  Damages available under the Survival Act include conscious pain and suffering, loss of earnings from the date of injury until the decedent's death, and loss of future earnings, less the cost of maintenance. *Altamuro v. Milner Hotel, Inc.,* 540 F.Supp. 870, 878 (E.D.Pa.1982). Additionally, punitive damages are available under the Survival Act if the decedent would be entitled to them. *Harvey v. Hassinger,* 315 Pa.Super. 97, 461 A.2d 814, 815 (Pa.Super.Ct.1983).

According to defendants, there is no genuine dispute as to any material fact to support the claim that Wilkoski was conscious, and experienced any pain or other sensations, between the moment of impact, i.e., when he was injured, and the time of death. (ECF No. 180 at 3) (citing *See Nye v. Com., Dep't of Transp.*, 480 A.2d 318, 321 (Pa. Super. 1984) (explaining that where there is "no evidence that decedents were conscious at any time after the accident, any award of

10

damages for conscious pain and suffering between the time of injury and the time of death [is] unwarranted.") Defendants argue that no lay witness testified that they saw Wilkoski conscious after the accident. In addition, they argue, Plaintiff's experts cannot testify, with any certainty, that Wilkoski was not rendered unconscious at the time of impact. According to Defendants, Plaintiff's experts, while experts in their general areas of practice, are not qualified to render opinions on the specific issue of whether Wilkoski experienced conscious pain and suffering after impact. Thus, they argue that partial summary judgment is warranted, because there are no facts of record to support that Wilkoski was conscious after impact; any opinions that he experienced pain and suffering, are speculative, in Defendants' view.

The Court notes that defendants do not appear, at this juncture, to move to exclude the testimony of Stanisha and Hoysan, the other drivers at the scene.  A lay witness "may testify to distinct facts observed by him concerning the apparent physical condition or appearance of another." *Commonwealth v. Counterman*, 719 A.2d 284, 301 (Pa. 1998). Moreover, a lay witness may testify as to certain matters involving health and obvious symptoms, but "his testimony must be confined to facts within his knowledge, and may not be extended to matters involving the existence or non-existence of a disease, which is only discoverable through the training and experience of a medical expert." *Cominsky v. Donovan*, 846 A.2d 1256, 1259 (Pa. Super. 2004) (citation omitted).  In *Counterman*, the court noted:

> Evidence is relevant if it renders the desired inference more probable than it would be without the evidence. *Commonwealth v. Eubanks*, 511 Pa. 201, 208, 512 A.2d 619, 623 (1986). A lay person may testify to distinct facts observed by him concerning the apparent physical condition or appearance of another. *Commonwealth v. Allison*, 550 Pa. 4, 8, 703 A.2d 16, 18 (1997). Indeed, lay testimony as to whether a patient was alert at all times, oriented, in pain, and concerned about her condition has been deemed permissible. *See Commonwealth v. Stickle,* 484 Pa. 89, 106, 398 A.2d 957, 966 (1979).

*Id.* at 301.

11

As to the testimony of Dr. Luckasevic, Federal Rule of Evidence 702 governs the admissibility of expert testimony. "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [, i.e., reliability]; and (3) the expert's testimony must assist the trier of fact [, i.e., fit]." *United States v. Schiff,* 602 F.3d 152, 172 (3d Cir. 2010) (alterations in original) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)).

As to qualifications, an expert witness must demonstrate "specialized knowledge" in the subject matter of his testimony. *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). Qualifications include "specialized expertise." *Pineda v. Ford Motor Co*., 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). A "broad range of knowledge, skills, and training qualify an expert." *Waldorf*, 142 F.3d at 625 (quoting *Paoli*, 35 F.3d at 741-42). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda*, 520 F.3d at 244 (citing *Paoli,* 35 F.3d at 741). Further, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co*., 80 F.3d 777, 782 (3d Cir. 1996)).

Rule 702's second requirement requires that "the process or technique the expert used in formulating the opinion is reliable." *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 742 (3d Cir. 1994). Therefore, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742 (quoting *Daubert v. Merrell Dow*

12

*Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Assessment of whether testimony is based on a reliable foundation is "flexible." *Daubert,* 509 U.S. at 594. For the third requirement, the proffered expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. Although the applicable standard for determining "fit" is "not that high," it is nonetheless "higher than bare relevance." *Paoli,* 35 F.3d at 745.

The Court finds that Plaintiff has met her burden to demonstrate that Luckasevic used reliable principles and methods to reach his conclusions. The District Court's role here is not as the finder of fact. *Vilkofsky*, 2018 WL 2937693, at *5. Instead, the focus appropriately goes to the methodology of the expert to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S. at 590); *In re TMI Litigation*, 193 F.3d 613, 713 (3d Cir. 1999) (district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility"). "The District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert*." *Walker v. Gordon*, 46 Fed. Appx. 691, 694 (3d Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999)). Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). The party that proffers the expert testimony is not required to prove to the court that the expert's conclusion is correct. *See Mitchell,* 365 F.3d at 244 (citation omitted).

When assessing Dr. Lucksevic's opinion, we note that he reviewed, inter alia, the

decedent's medical records, the police crash report, and the statement of Josh Stanisha.  He relied

upon published abstracts which provide sufficient basis for the period of time that a person can

lose consciousness after having blood supply to the brain disrupted.  (ECF No. 189 at Ex. 1-3).

He has experience performing autopsies on several drivers that had videos inside their vehicles.

(ECF No. 182-1 at 11). The evidence of record supplied by Plaintiff's expert supports a factual

basis that the injuries to the decedent caused hyperflexion of the spine, which resulted in

fractures, a disruption of the vertebral arteries, and likely paralysis of the diaphragm.  Dr.

Lucksevic's expert testimony is sufficiently tied to the facts of the case such that it will aid the

jury in resolving a factual dispute.  A reasonable factfinder could conclude that the physical

occurrences disrupted the breathing process and explain brain anoxia.  Dr. Luckasevic, who has

specialized knowledge in injury mechanisms, opined that there were 10 to 15 seconds between

cessation and breathing to unconsciousness; this opinion is based upon published studies of

ligature-type cessation of breathing. (ECF No. 189-1 at 1).  There was no evidence of intracranial

injury or concussion, distinguishing this Court's conclusion from that of *Fisher v. Clark Aiken*

*Matik, Inc.*, Case No. 3:99-cv-01976, at p. 18 (M.D. Pa. Sept. 7, 2006) (ECF No. 184).    This

opinion, in conjunction with all other record evidence, when taken in the light most favorable to

the non-movant, suffices to permit this case to proceed to a jury for a final decision on whether

the decedent experienced conscious pain and suffering. *Mecca v. Lukasik*, 530 A.2d 1334, 1344–

45 (Pa. Super.1987) (under Pennsylvania survivorship law, jury properly instructed that it could

award conscious pain and suffering damages where there was no evidence that crash victims

were rendered immediately unconscious in car accident); *Teamann v. Zafris*, 811 A.2d 52, 64–66

(Pa. Commw. 2002), abrogated on other grounds by *McCreesh v. City of Phila.*, 585 Pa. 211, 888

A.2d 664 (2005) (under Pennsylvania survivorship law, award of pain and suffering damages

based upon "several seconds" of consciousness allowed; amount of jury verdict reduced from $900,000 to $700,000 because "the shorter the duration of pain and suffering the smaller the award"). *Monheim v. Union R. Co*., 996 F. Supp. 2d 354, 369 (W.D. Pa. 2014).

## IV.  Conclusion

For the reasons stated herein, Defendants' motion for partial summary judgment will be denied.

An appropriate order will be entered.


Dated:  September 19, 2022                       /s/ *Robert J. Colville*
                                                 Robert J. Colville
                                                 United States District Judge


cc: all counsel of record *via CM/ECF electronic filing*